### ALSCO–HARVARD FRAUD LITIGATION Consolidated Cases.

### Civ. A. No. 659–71.

United States District Court,
District of Columbia.

Aug. 21, 1981.

793

Alexander Younger, Washington, D. C., for plaintiff.

Edward F. Canfield, Washington, D. C., for defendant A. L. Stone.

Francis Rosenbaum, pro se.

## MEMORANDUM

OBERDORFER, District Judge.

### I. INTRODUCTION

In this civil action, plaintiff United States has moved for summary judgment against defendants Andrew L. Stone and

Francis N. Rosenbaum. Both defendants have been charged with violations of the False Claims Act, 31 U.S.C. § 231 (1976); breach of warranty; liability under the doctrine of "recoupment of public funds paid by mistake"; and violations of the Anti-Kickback Act, 41 U.S.C. §§ 51 et seq. (1976). In addition, the Government seeks imposition of a constructive trust upon certain property that allegedly is traceable to defendants' wrongful acts. Plaintiff's claims are set forth in a First Amended Complaint filed with this Court, and in a First Amended Complaint filed in the United States District Court for the Eastern District of Missouri.[1] The actions have been consolidated here by the Judicial Panel on Multidistrict Litigation because both actions arise out of a common factual background of alleged fraud against the United States Government.[2] The other suits that were part of this Multidistrict Litigation have been terminated;[3] only the United States' actions against defendants Stone and Rosenbaum remain. In addition, the United States Tax Court has under advisement the report of Special Trial Judge Caldwell in *Rosenbaum, et al. v. Commissioner,* Docket Nos. 5199–72, 5200–72, 5311–72, 5312–72, and 2460–75.

For reasons stated below, the Court grants plaintiff's motion for summary judgment in part, and denies it in part.

### II. BACKGROUND FACTS

Plaintiff's claims against defendants Stone and Rosenbaum are based upon an alleged scheme of fraudulent conduct in the sale of 2.75-inch rocket launchers to the Navy during the years 1962 through 1968 by Chromcraft Corporation (hereinafter "Chromcraft") and its corporate successor, Alsco, Inc.[4] The fraudulent conduct is al-

1. The action filed in this Court names Andrew L. Stone and Francis N. Rosenbaum as defendants. The Missouri action names Stone, Chromcraft Corporation and Alsco, Inc. as defendants. The latter two corporate entities have been dismissed pursuant to a Consent Judgment approved by this Court on November 19, 1976.

2. *See, In re Alsco-Harvard Fraud Litigation,* 328 F.Supp. 1405, 325 F.Supp. 315 (Jud.Pan. Mult.Lit.1971).

3. *See, e. g.,* Consent Judgment (November 19, 1976).

4. Subsequent to the events at issue, Alsco, Inc. became Harvard Industries. Harvard was

leged to have occurred in connection with two components of the rocket launchers: the electrical assemblies, which relate to the mechanism by which the rockets are fired, and the fairings, which are the molded fibre nose cone and aft attachments to the launchers. In its Complaints, plaintiff has alleged that Stone and Rosenbaum, who were the president of Chromcraft and its special counsel respectively, submitted or caused to be submitted to the Navy inflated cost data regarding the electrical assemblies and fairings, as a result of which the Navy overpaid Chromcraft, with the overpayments accruing to defendants. Plaintiff suggests the defendants' scheme is segregable into three distinct phases: 1) the "Scientific/Bregman" stage; 2) the "Republic" stage; and 3) the "Western Molded" stage.

A. *The Scientific/Bregman Stage*

During the first phase of the scheme, which occurred between March 1963 and December 31, 1965, Stone and Rosenbaum allegedly submitted or caused to be submitted inflated cost data regarding electrical assemblies through the use of two subcontractors, Scientific Electronics, Limited (hereinafter "Scientific") and Bregman Electronics, Inc. (hereinafter "Bregman"). The Government contends that Scientific and Bregman were "dummy" corporations established by Stone and Rosenbaum and subject to their control.

According to plaintiff, defendants represented to the Navy that they had purchased completed electrical assemblies from Scientific and Bregman for prices independently set by those subcontractors. In fact, however, the Government alleges that Scientific and Bregman were sham corporations that created false invoices for Chromcraft and accumulated the resulting payments from Chromcraft for the use and benefit of Stone and Rosenbaum. Specifically, the Government contends that the electrical assemblies for the launchers were assembled not by Scientific and Bregman but instead by Rob-

ert L. Wolf and Associates (hereinafter "Wolf") with raw materials that Chromcraft purchased from other vendors and supplied directly to Wolf without charge. The purchase orders addressed to Wolf were, however, typed on Scientific and, later, on Bregman stationery. Wolf would bill the work for his assembly services on invoices addressed to Scientific and Bregman but actually delivered to Chromcraft. Scientific and Bregman would then pay the Wolf invoices out of money received from Chromcraft. Stone's secretary would, at Stone's direction, in turn type quotation letters whereby Scientific and Bregman purported to quote prices for the electrical assemblies to Chromcraft. Chromcraft would then respond to Scientific's and Bregman's quotations by preparing purchase orders, responsive invoices per the quoted prices, as well as receiving reports reflecting the receipt of the units at Chromcraft's plant. The prices set forth in these fictitious Bregman and Scientific quotation letters, invoices and corresponding Chromcraft purchase orders were included in the cost data furnished by Stone to the Government and were in fact paid by the Government under the contracts awarded Chromcraft. These prices were substantially higher than the combined amount in fact paid to Wolf for assembly charges and to other vendors for the raw materials supplied to Wolf.

The Government also contends that defendants used fictitious invoices from foreign companies to siphon the illegal profits thus made out of Scientific and Bregman. The invoices came to Scientific and Bregman from several Swiss and Liechtenstein entities, and purported to be for raw materials shipped to the dummy corporations. Scientific and Bregman paid the invoices, allegedly upon instructions from Stone and Rosenbaum. It is undisputed that the checks were negotiated by the Swiss and Liechtenstein entities, and the proceeds were remitted to Swiss bank accounts in which, according to plaintiff, Stone and Ro-

named a defendant in two suits brought by the Government, but it is no longer a party by

reason of a settlement approved by order dated November 19, 1976.

senbaum purportedly held concealed interests.

Defendants counter this characterization of the Scientific/Bregman phase by contending that both Scientific and Bregman were formed as bona-fide attempts by Chromcraft to obtain a "second supplier" (in addition to Wolf) of the electrical assemblies needed for the rocket launchers. They allege that neither entity was controlled by Stone or Rosenbaum, except insofar as both companies relied extensively on Chromcraft's business. Moreover, defendants suggest that Scientific's and Bregman's use of Wolf as a vendor of electrical assemblies was known to both Chromcraft and the Navy, and not objected to by either. Wolf was to be the supplier until Scientific and Bregman could become geared up as a second supplier, an event that in the eyes of defendants unfortunately never transpired. Instead, Wolf was the only supplier of assemblies during this period, and it utilized raw materials supplied directly by Chromcraft and on occasion "drop shipped" completed assemblies at Chromcraft's plant, despite working through Scientific and Bregman. Wolf's relationship with Chromcraft was not out of the ordinary, according to defendants, and its contact with Chromcraft did not violate its role as a bona-fide subvendor of Scientific and Bregman.

As for the siphoning of excess profits to Swiss bank accounts, Stone and Rosenbaum do not dispute the Government's demonstration of the flow of funds but attempt instead to explain that Scientific and Bregman accumulated sizeable bank accounts not because of any excess profits, but because Chromcraft did not bill the companies for raw materials used in the electrical assemblies, materials that Chromcraft supplied to Wolf directly. Scientific and Bregman paid for the raw materials upon receiving invoices from foreign companies, and the monies found their way into Swiss accounts, accounts that defendants allege they did not control and/or use to their own use and benefit.

**5.** In January 1966, Falrock also acquired 44 percent of the outstanding common stock of Alsco. In that transaction, Falrock's source of funds, according to the Government, was the

## B. *The Republic Stage*

In late 1965 and early 1966 the "Scientific/Bregman" phase ended with Chromcraft's discontinuance of Bregman as a subcontractor. At about that time, defendants allegedly used Falrock Corporation (hereinafter "Falrock"), a corporation they allegedly controlled, to acquire 62 per cent of the outstanding common stock of Republic Electronics Industries Corporation (hereinafter "Republic"). Republic was an ongoing electronics manufacturer that was in financial difficulty and ripe for a takeover. Falrock's interest in Republic allegedly was financed by funds that had been siphoned off Scientific's and Bregman's fund of excess profits and deposited in a secret Swiss bank account.[5]

Upon acquiring control of Republic, the Government contends, defendants used it in much the same way as they allegedly had used Scientific and Bregman to raise artificially the prices ultimately charged to the Navy for rocket launchers. Specifically, plaintiff alleges that Stone and Rosenbaum caused Chromcraft (and then Alsco) to represent to the Navy that Republic manufactured the launchers' electrical components in their entirety, and sold them to Chromcraft and Alsco at specified prices which were included in the total contract prices which the Navy paid. In fact, however, Chromcraft and Alsco allegedly continued the practice of directly purchasing raw materials and supplying them at no cost to Wolf who remained the undisclosed assembler for virtually all of the electrical components produced during the Republic phase. As in the Scientific/Bregman phase, Republic's prices were substantially higher than the cost of the raw materials plus Wolf's assembly charge. In addition, the Government contends that Republic fabricated invoices and quotation letters for Chromcraft and that Chromcraft in turn submitted false purchase orders to Republic, all hiding

same Swiss bank account that was the repository for Scientific and Bregman's excess profits.

the fact that Wolf was the real supplier of the vast majority of electrical assemblies. Republic accordingly accumulated large false profits during this period.

Defendants deny plaintiff's characterization of Republic's role in the rocket launcher controversy. They contend that after Scientific's and Bregman's failure to become the hoped-for "second supplier" of electrical assemblies, Chromcraft turned to Republic, an established electronics firm. According to defendants, after Falrock's acquisition of Republic (without the use of fraudulently-obtained funds), Chromcraft assisted the company's entrance into the business of assembling the electrical components required by 2.75-inch rocket launchers. With Chromcraft's technical assistance, and through application of the fruits of its research and development efforts, Republic was able to become a reliable, efficient producer of electrical assemblies, a producer that supplanted Wolf as the number one supplier of assemblies. Defendants admit that Wolf continued as a supplier, but that its role was never hidden from Chromcraft or the Navy. Also, defendants do not contest the fact that Chromcraft continued its practice of supplying the raw materials for the assemblies to Republic (and Wolf), a practice that they allege is not uncommon in the industry. Finally, defendants contend that Republic's increasingly stable financial position during this phase was not due to excess profits, but to Chromcraft's commitment to making them a reliable second supplier of needed electrical assemblies.

## C. *The Western Molded Stage*

Western Molded Fibre Products, Inc. (hereinafter "Western Molded") was a Chromcraft subcontractor that manufactured the "fairings" (nose cone and fins) for Chromcraft's rocket launchers. According to plaintiff, Stone induced Western's president, in 1963, to increase the price of fairings by a designated amount per set and to accrue the amount on Western's books in order to pay kickbacks to himself and Rosenbaum. The fairing prices were increased, Chromcraft paid the increase, and Stone and Rosenbaum allegedly caused Chromcraft to certify to the Navy that the increased price represented a legitimate cost of the fairings. The Navy, by paying the contract price to Chromcraft, financed the kickbacks.

Plaintiff also contends that Western accumulated a large surplus as a result of accruing the kickback payments on its books. Stone and Rosenbaum purportedly eliminated this surplus by causing a stream of fictitious invoices from five Swiss and Liechtenstein entities to be sent to Western for phenolformaldehyde or electrical parts which were not to be, and were not in fact, delivered to Western. For its part, Western paid the fictitious foreign invoices and, following negotiation of Western's checks in Switzerland, the proceeds allegedly were remitted to Stone's and Rosenbaum's Swiss bank accounts.

Defendants again dispute plaintiff's interpretation of their conduct. They admit that Western Molded increased the prices of its fairings, but the increase was not a kickback. Instead, they suggest that the differential in price was payment for the increased cost of producing the new, grenade-type fairings, and also partial payment for Chromcraft's developmental cost in designing the new fairings and rocket launchers. Stone and Rosenbaum contend that the president of Western Molded recognized his company's responsibility to reimburse Chromcraft for its developmental costs, but the president decided to do so through the use of false invoices for nonexistent materials because his company could not "justify" the expenditures publicly in view of its own research and development budget.

## III. PRELIMINARY MOTIONS

Defendants have moved to dismiss Claims Two, Three and Five of the First Amended Complaints because of the lack of an indispensable party under Rule 19(b) of the Federal Rules of Civil Procedure. Plaintiff does not oppose the dismissal of the Second Claim, and it accordingly is dismissed.

■ The third Claim alleges the defendants are liable to plaintiff under the doctrine of recoupment of public funds paid by mistake. Under that common law theory, the Government can "recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts,* 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938). The standard is that "if the Government made these payments under an erroneous belief which was material to the decision to pay, it is entitled to recover the payments." *United States v. Mead,* 426 F.2d 118, 124 (9th Cir. 1970).

Defendants contend that, even assuming the doctrine's application in this case, the plaintiff's failure to join Chromcraft and Alsco requires the Court to dismiss the claim under Rule 19(b) because Chromcraft and Alsco are indispensable parties. According to defendants, Chromcraft and Alsco are needed "not only to show such matters as payment and the alleged mistake, but to prevent Chromcraft/Alsco, which has reserved its rights in this matter against Stone, from instituting an action to recover funds from Stone after the adjudication of this case." *See* Consolidated Response of Defendant Stone to Motion for Summary Judgment at 75 (March 5, 1979).

Defendants' motion is without merit. Rule 19(b) requires the Court to determine whether "in equity and good conscience" the action should proceed despite the absence of a party, or whether the suit must be dismissed because the absent party is indispensable. In considering indispensability, the Court should consider the following factors:

[F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. F.R.Civ.P. 19(b).

■ Applying these factors to the case at hand, the Court finds that Harvard Industries, the corporate successor to Chromcraft and Alsco, is not an indispensable party to the third Claim of the Amended Complaints. Any judgment rendered against Stone and Rosenbaum under this claim would not be prejudicial to Harvard—it already has settled with defendants and with the United States and forsaken the claims it once asserted in this litigation. *See* Order and Judgment (November 13, 1976). Defendants contend that *they* will be prejudiced by Harvard's absence, but their prejudice is not a factor relevant to Rule 19(b) and, moreover, they will not be prejudiced because Harvard has abandoned any recourse it might have against them. *See id.* ¶ 3. As for defendants' argument that Harvard is needed in order to prove the alleged mistake, that duty rests upon plaintiff—Harvard need not participate.

Defendants similarly contend that the Fifth Claim of the Amended Complaints should be dismissed for failure to join an indispensable party. Once again defendants fail to persuade the Court. Under the Fifth Claim, plaintiff requests that a constructive trust be put on certain assets that allegedly represent the fruits of defendants' fraudulent scheme.[6] Defendants argue that the Falrock Corporation must be a party to this Claim because its assets are implicated by plaintiff's charge.[7] They suggest that because Falrock's right of ownership of certain of its assets are at issue, it necessarily must be a party to this Fifth Claim.

■ Defendants' contention might be well taken except that Falrock has surren-

---

**6.** An injunction already has been placed on certain assets that may qualify for a constructive trust under the Fifth Claim. *See,* Judgment (December 27, 1976), *United States v. Falrock Corporation, et al,* No. 76–2350 (D.D.C.).

**7.** The injunction now in effect limits Falrock's power to dispose of the stock it holds in the Heath Tenca Corporation.

dered its right to contest this Court's resolution of plaintiff's Fifth Claim. The Consent Judgment entered on December 27, 1976 in *United States v. Falrock Corporation*, C.A. No. 76–2350 (D.D.C.) states, in part:

> 7. Defendants herein having adopted any and all defenses, of whatever nature, which are or which could be interposed by the defendants in *Alsco-Harvard*, and having agreed to be bound by the terms of any final judgment entered in *Alsco-Harvard*, the entry of a final judgment on the Fifth Claim of plaintiff's First Amended Complaint in *Alsco-Harvard* shall in all respects adjudicate the rights and liabilities of defendants herein with respect to the aforesaid stock of Heath Tecna Corporation.

Thus Falrock has abandoned any claims it might have against defendants insofar as those claims would arise from disposition of this Fifth Claim for a constructive trust. It therefore cannot be prejudiced by this litigation in any legally meaningful manner, and its absence also does not affect the enforceability of a constructive trust should one be placed upon its assets.

In refusing to dismiss plaintiff's Fifth Claim for failure to join an indispensable party, the Court does not express, of course, any opinion about the ultimate disposition of that claim.

▮ Finally, on June 5, 1981 Rosenbaum filed a motion to dismiss in which he alleges *inter alia* that this action should be dismissed for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Rosenbaum alleges that "plaintiff has done nothing to prove the claim it has asserted against defendants, other than to take depositions which were substantially completed by 1973." Memorandum in Support of Motion to Dismiss at 3. In fact, however, plaintiff has filed a detailed motion for summary judgment and has opposed any stay in the proceedings. The facts of the case do not in any way warrant

the "drastic step" of dismissal for failure to prosecute suggested by Rosenbaum. *Jackson v. Washington Monthly Co.*, 569 F.2d 119, 123 (D.C.Cir.1977).

## IV. THE MOTION FOR SUMMARY JUDGMENT

### A. *Threshold Questions*

Defendant Stone opposes plaintiff's motion for summary judgment because, *inter alia*, plaintiff allegedly violated his constitutional rights, because plaintiff's motion does not conform to Rule 56, and because defendant has been unable to present all the affidavits and evidence to which he is entitled. None of these contentions have merit.

Defendant Stone's due process complaints concern alleged interference with his parole by plaintiff and alleged interference with his legal defense by the Internal Revenue Service's attachment of funds designated for his legal fees, and by the Government's decision to depose him while in jail. Defendant Rosenbaum voices similar due process complaints, contending that the harshness of his confinement deprived him of funds and prevented him from vigorously defending this case.[8] He complains, for example, that his lack of funds has prevented him from taking any discovery that would help him oppose the motion for summary judgment now before the Court. Rosenbaum also reminds the Court that a previous Order of this Court reserved the question whether plaintiff's depositions could be used against Rosenbaum on a motion for summary judgment. *See* Memorandum and Order (January 23, 1976).

Stone's and Rosenbaum's due process arguments already have been considered by this Court, and they need not detain us further. Specifically, both defendants filed extensive motions to dismiss based in large part on their due process complaints. The motions to dismiss were denied for reasons stated in plaintiff's memoranda. *See* Order (April 14, 1978). *See also* Memorandum

---

**8.** Rosenbaum raised this argument most recently in his supplemental motion to dismiss filed June 5, 1981.

and Order (January 23, 1976); Memorandum and Order (January 8, 1974). Thus defendants' contentions regarding alleged interference with their ability to present a defense in this case already have been decided in plaintiff's favor.[9] Defendant Stone also opposes plaintiff's summary judgment motion on the ground that it does not comport with Rule 56. Stone argues that the motion does not concisely state the material facts not in dispute, and he renews his and Rosenbaum's complaints regarding the inadequacy of their discovery. *See* F.R.Civ.P. 56(f). Once again defendants' arguments do not persuade the Court.

First, the Court finds that plaintiff's motion satisfies Local Rule 1–9(h). It includes a statement of material facts not in issue. Defendant Stone's complaints that the "9(h)" statement is too lengthy and contains immaterial and general facts are unavailing. Stone may be unhappy with the burdensomeness of responding to plaintiff's many papers, but his displeasure does not justify dismissal of plaintiff's bona-fide attempt to comply with Local Rule 1–9(h) and F.R.Civ.P. 56.[10] This litigation is highly complex and plaintiff's motion substantially comports with the governing rules.

Second, defendants' contentions that the Court should deny the motion for summary judgment or, at least, should continue it until defendants can take more discovery under Rule 56(f)[11] are not persuasive. Defendants have had, during the long course of this litigation, many opportunities to pursue discovery efforts of their own, either by depositions, interrogatories, requests for documents and admissions, and the like. The Court cannot now delay this litigation further because of their failure to complete discovery.[12] Indeed, as the case has unfolded, it appears that defendants do not need any additional discovery to successfully oppose plaintiff's motion for summary judgment. As explained below, the Court has denied the bulk of that motion.

Defendant Stone's renewed argument that his lack of funds has prejudiced his defense, and that his and Rosenbaum's inability to attend plaintiff's key depositions has denied them their constitutional right to cross examination, also are without merit. The Court is sympathetic to Stone's financial straits, especially in light of the Internal Revenue Service's attachment of those assets intended to serve as Stone's defense fund,[13] but neither he nor Rosenbaum is indigent. Even if they were, indigent defendants do not have the right to have court-appointed counsel in civil cases where defendants do not face possible loss of their physical liberty. *See, e. g., Lassiter v. Department of Social Services of Durham Cy., North Carolina,* —— U.S. ——, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); Plain-

9. As mentioned above, this Court's January 23, 1976 memorandum and order reserved the question whether plaintiff could use depositions against defendant Rosenbaum in a motion for summary judgment. The Court need not decide that question because it finds that defendants prevail on those portions of plaintiff's summary judgment motion that are based on deposition testimony.

10. Stone also argues that plaintiff's 9(h) statement is inadequate because it does not mention claims 2, 3, and 5. This contention is wide of the mark. The 9(h) statement describes facts not in dispute. It is not intended to set forth legal theories.

11. F.R.Civ.P. 56(f) states:

Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained depositions to be taken or discovery to be had or may make such other order as is just.

12. The Court may be sympathetic to a motion to reopen discovery to aid pretrial preparation of the parties if such discovery would not interfere with a trial date for this case and if it would not unduly burden any of the parties in this litigation.

13. As the trial of this case approaches, the Court renews Judge Weiner's suggestion in his January 8, 1974 memorandum that the Government "give careful consideration to a plan that would permit the movants a reasonable amount to apply towards their defense. This practical situation may prevent this costly and time-consuming case from terminating as an exercise in futility." *Id.* at 5.

tiff's Opposition to Defendants' Motion to Dismiss at 19–26 (Sept. 20, 1976) (incorporated in this Court's April 14, 1978 Order). As for their absence at certain depositions conducted by plaintiff, defendants have not demonstrated that they did not have notice or opportunity to attend the depositions. The record in this case contains notices of the depositions that were sent to defendants, and defendants' subsequent failure to attend results in a waiver of their rights to object to the depositions. *See* F.R.Civ.P. 32; *Houser v. Snap-on-Tools Corp.*, 202 F.Supp. 181 (D.Md.1962). The Court also notes that the depositions have not significantly damaged defendants because they have put sufficient material facts in dispute to avoid a complete grant of summary judgment against them. Also, defendants have had ample opportunity to cross examine several of the deponents in Tax Court litigation that has arisen out of the same facts and occurrences that form the basis of the present suit.

Finally, on June 27, 1980, defendant Stone filed a supplemental memorandum in opposition to plaintiff's motion for summary judgment in which he argued that Special Trial Judge Caldwell's report to the Tax Court "supports" Stone's contention that material facts are in dispute which preclude granting summary judgment in plaintiff's favor. However, this report which the Tax Court continues to have under review, is merely interlocutory and advisory in nature and therefore is not a final judgment establishing a basis for denial of plaintiff's motion.

In sum, neither Stone's nor Rosenbaum's scatter gun attack on due process, discovery, or pecuniary deficiencies persuades the Court that they are valid defenses to the summary judgment motion now pending before the Court.

### B. *Estoppel Effect of the Guilty Plea*

On February 10, 1970, defendants Stone and Rosenbaum plead guilty to several counts of a criminal indictment that had been lodged against them in *United States v. Stone, Rosenbaum, et al.*, Criminal Nos. 1233–68 (D.D.C.). Specifically, they plead guilty to nine counts of a thirty count indictment. They admitted participation in a conspiracy to commit an offense or to defraud the United States under 18 U.S.C. § 371 (Count 1) [14], and they plead guilty to making knowingly false, fictitious or fraudulent statements or representations to the Government in violation of 18 U.S.C. § 1001 [15] with regard to eight specific Government contracts: NOw 64–0190f (Count 3); NOw 65–0121f (Count 7); NOw 65–0472f (Count 8); NOw 65–0547f (Count 9); NOw 66–0082f (Count 10); NOw 66–0307f (Count 11); Form RB–1 filed June 2, 1965 (Count 15); and Form RB–1 filed April 28, 1966 (Count 16).

Plaintiff contends that defendants' guilty pleas estop them from denying complicity under the False Claims Act, Anti-Kickback Statute and various common law claims presented by plaintiff in the civil complaints brought against defendants. Indeed, the United States alleges that Stone's and Rosenbaum's pleas conclusively establish defendants' False Claims violations re-

---

**14.** 18 U.S.C. § 371 states:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment of such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

**15.** 18 U.S.C. § 1001 states:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

lating to all the contracts entered into between Chromcraft/Alsco and the Government during the Scientific/Bregman and Republic stages of the fraud, as well as an Anti-Kickback claim relating to Chromcraft's relationship with Western Molded. The Government accordingly has moved for summary judgment.

Defendants offer basically three responses to the Government's contention. They argue, first, that their pleas were not knowing or voluntary in the sense that they would not have plead guilty had they been aware that such pleas might work an estoppel against them in these civil suits.[16] Second, they contend that a guilty plea does not act as an estoppel in a related civil case. Finally they suggest that, even assuming *arguendo* that their pleas act as an estoppel, the estoppel only applies to the specific counts that defendants admitted; the plea of guilty to the conspiracy count was not an admission of guilt as to each substantive false claim enumerated therein.

### 1. *Validity of Guilty Plea*

Faced with the application of their guilty pleas against them in this civil action, both defendants complain in their memoranda that their pleas were made without knowledge of the possible consequences that they might bring, and also without true conviction—both defendants suggest that they plead guilty for reasons of expediency rather than actual guilt. Additionally, defendant Rosenbaum argued at length at the hearing on plaintiff's motion for summary judgment that this plea has no estoppel effect because he was not fully aware what he was pleading guilty to.

■ Defendants' excuse for their guilty pleas come too late. The transcripts of the proceedings before Judge Gasch on October 13, 1969, at which defendants pled guilty additionally makes clear that Rosenbaum fully understood the nature and implications of the counts to which he pled guilty. Defendants' attorney, Edward Bennett Williams, stated in those proceedings that "these counts and all the implications of the counts have been very carefully explained to [the defendants]." Additionally, the transcript reflects that Rosenbaum, himself an attorney, answered affirmatively the judge's questions whether he "fully understood [the] charges brought by the Government" to which he was pleading guilty and whether he was entering his plea "voluntarily and of [his] own free will and for no other reason." And both Stone and Rosenbaum unequivocally stated in open Court that they were pleading guilty because they were, in fact, guilty of the crimes to which they pled. Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Exhibit B at 4–8. They cannot now engage in *post hoc* rationalizations for their admissions, at least for purposes of mitigating the estoppel effect of their pleas. Like the petitioner in *Plunkett v. Commissioner*, 465 F.2d 299 (7th Cir. 1972), defendants here cannot expect the Court "to look behind [their] convictions," especially when the record demonstrates that the pleas were made knowingly and voluntarily. *See also Brady v. United States*, 397 U.S. 742, 757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747 (1970); *Parker v. North Carolina*, 397 U.S. 790, 795, 90 S.Ct. 1458, 1461, 25 L.Ed.2d 785 (1970).

### 2. *Plea Estoppel*

■ Defendants further argue that although a judgment after full litigation in a criminal case may, in some circumstances, conclusively establish liability for a related civil suit, a plea of guilty does not do so. Defendants' argument does find some sup-

---

16. Defendant Stone also complains that the wording of the indictment differs in significant respects from that captioned in the civil complaints. For example, he states that at most he admitted to "inflated prices" in the criminal proceeding, not the "grossly inflated" prices alleged in the civil matter. This is a distinction without legal significance. The civil liability in this case only requires a showing of inflated (i.

e., false, fictitious, or fraudulent) prices—plaintiff's vivid use of adjectives does not address the legal question of liability. Also, Stone's contention that the guilty plea only deals with DD form 633 while the complaint also encompasses "related documents" is incorrect. *See*, e. g., Indictment, Count 1 ¶ 21–24; Counts Two through Thirteen ¶ 2.

port, especially by state courts or federal courts construing state law,[17] but well-established principles of federal law hold that guilty pleas collaterally estop the future civil adjudication of issues necessarily admitted to by the plea. *See generally, Emich Motors v. General Motors*, 340 U.S. 558, 568, 71 S.Ct. 408, 413, 95 L.Ed. 534 (1951); *United States v. Podell*, 572 F.2d 31 (2nd Cir. 1978).

■ In *United States v. Ben Grunstein & Sons Co.*, 127 F.Supp. 907 (D.N.J.1955), for example, certain defendants had previously pleaded guilty to a false claims conspiracy. The Court held that their pleas estopped them from relitigating the conspiracy issue under the False Claims Act. In reaching this conclusion, the Court was careful to point out that it is not material whether the judgment of conviction resulted from a trial or a plea of guilty. Both are formal admissions of guilt. "Indeed at times a plea of guilty is given greater scope than is a judgment of conviction after trial..." *Id.* at 909–10. Similarly, in *United States v. Schneider*, 139 F.Supp. 826 (S.D.N.Y.1956), a case involving the collateral estoppel effect of a plea under the Surplus Property Act, a statute similar to the False Claims Act, the Court rebutted defendants' argument that guilty pleas should not be given as much estoppel effect as convictions that are based on full trials:

> [W]here the prior conviction resulted from a plea of guilty there would appear to be greater warrant for application of the doctrine [than after a trial on the merits] since the defendant has admitted the truth of the charges contained in the indictment. *Id.* at 829.

*See generally, Ivers v. United States*, 581 F.2d 1362 (9th Cir. 1978); *Metros v. United States District Court for District of Columbia*, 441 F.2d 313, 316–17 (10th Cir. 1970); *Hyslop v. United States*, 261 F.2d 786 (8th Cir. 1958); *United States v. Accardo*, 113 F.Supp. 783 (D.N.J.1953), *aff'd.* 208 F.2d 632 (3d Cir.), *cert. denied*, 347 U.S. 952, 74 S.Ct.

677, 98 L.Ed. 1098 (1954). As recently summarized by the Court in *United States v. Cripps*, 460 F.Supp. 969 (E.D.Mich.1978), when granting a Government motion for summary judgment in a civil suit under the False Claims Act:

> It is well established that a prior criminal conviction establishes the facts underlying the conviction conclusively for purposes of a subsequent civil proceedings instituted by the federal government on the basis of the same facts. Collateral estoppel is operative whether the conviction is obtained by jury verdict or through a guilty plea. *Id.* at 975.

*See also, United States v. Krietemeyer*, 506 F.Supp. 289, 292 (S.D.Ill.1980) (defendants' guilty pleas held to establish civil liability for purposes of partial summary judgment under the False Claims Act).

3. *Scope of the Guilty Plea Admissions*

■ Just as it is clear that a guilty plea can collaterally estop the relitigation of certain issues in subsequent civil litigation, it also is clear that the estoppel extends only to those issues that were essential to the plea. *Emich Motors v. General Motors*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951); *Brown v. United States*, 524 F.2d 693, 705 (Ct.Cl.1975).

■ Given this second, equally well-established principle, it is necessary to examine the issues that defendants necessarily admitted by pleading guilty to several counts of the criminal indictment lodged against them. As for Counts 3, 7, 8, 9, 10, 11, 15, and 16, defendants admitted, by their plea, that the "Certificates of Current Cost or Pricing Data" that accompany certain contracts, and that certain "Form RB-1" reports that account for costs and expenses during specified contract periods knowingly contained false, fictitious and fraudulent statements and representations. These admissions satisfy the requisites of

17. *See, e. g., United States v. Fabric Garment Co.*, 366 F.2d 530 (2d Cir. 1966); *Teitelbaum Furs, Inc. v. Dominion Insurance Co.*, 58 Cal.2d 601, 25 Cal.Rptr. 559, 375 P.2d 439 (1962).

the False Claims Act,[18] and thus defendants are liable under that Act for the false certificates and Forms RB–1.

The less obvious question is the estoppel effect of defendants' plea of guilty to the conspiracy count, Count 1. That count alleges that defendants conspired to frustrate proper Navy contract procedures by agreeing to submit false, fictitious and fraudulent statements and representations to the Government. The count also describes in some detail the United States' entire version of defendant's allegedly fraudulent scheme, beginning with the Scientific/Bregman stage, through the Republic stage, and into the Western Molded stage.

Plaintiff contends that defendants' plea of guilty to the conspiracy count of the indictment amounts to an admission of guilt to all the allegations made in Count 1, including the substantive allegations. They illogically argue that despite the dismissal of the majority of the indictment's substantive counts in exchange for defendants' plea, defendants are liable for the substantive allegations set forth in those counts because they are incorporated in the comprehensive conspiracy count.

Plaintiff's position finds no support in logic or in the law. A review of the following three, often-cited opinions demonstrates the fallacy of plaintiff's position.

In *United States v. American Packing Corp.*, 113 F.Supp. 223 (D.N.J.1953), a case strikingly similar to the one before the Court, the Government moved for summary judgment in a False Claims Act civil proceeding. The motion was based on defendants' plea of guilty to count one of the indictment—conspiracy. [18 U.S.C. § 371]. The count generally alleged defendants' conspiratorial conduct, and then described the conspiracy in some detail. The civil complaint contained ninety-nine counts that detailed asserted violations of the False Claims Act.

Faced with the question whether defendants' plea of guilty to the conspiracy count established their liability for the acts undertaken by the conspiracy as described in Count 1, the *American Packing* Court found that the plea was of limited effect. The Court concluded that "the plea of guilty to the charge of conspiracy must be confined to the judicial admission that the defendants engaged in a conspiracy to defraud the United States..." *Id.* at 225. The Court reasoned that pleas of guilty must be construed strictly, and that the admission of a conspiracy is not tantamount to an admission of responsibility for the complete recital of deeds that plaintiff ascribes to the conspiracy. As the Court stated: "[T]hough the defendants pleaded guilty to the general conspiracy, nevertheless the burden is on the Government to prove that the specific transactions affecting each contract were the fruitful result of said conspiracy." *Id.* at 225–26. "It would seem, therefore, that on the strength of the plea alone the Government would not be entitled to summary judgment as to liability." *Id.* at 226.

---

**18.** The substantive provision of the False Claims Act, 31 U.S.C. § 231 states in relevant part:

Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or caus-

es to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim ... shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.

Another decision reaching the same conclusion under similar facts is *United States v. Ben Grunstein & Sons Co., supra.* In that case, certain defendants had pled guilty to a conspiracy count of an indictment, but were opposing a summary judgment motion lodged against them in a related civil action under the False Claims Act. The civil complaint covered the conspiracy itself, but it also detailed more than 400 other counts of alleged substantive violations of the Act. The Court faced the question of the estoppel effect of the plea to the conspiracy count.

The *Grunstein* Court first recognized that a guilty plea did serve as an estoppel device, but only for issues "essential to the verdict." It then found that the many acts allegedly undertaken in furtherance of the conspiracy were not themselves admitted to by defendants by reason of their plea. As the Court stated:

> But since in a criminal conspiracy case proof of the unlawful agreement between the parties, plus the commission of any overt act, not necessarily all those alleged, suffices to support a verdict of guilty, no conviction of a criminal conspiracy, whether on verdict or plea, suffices of itself, without further evidence, to prove that defendant either admitted, or was found guilty by the jury, of committing any particular act. 127 F.Supp. at 910.

Following its reasoning to its necessary conclusion, *Grunstein* held that the admission of conspiracy estopped further relitigation of the question whether a conspiracy existed or not, but that the alleged effectuation of the conspiracy, manifested in the substantive counts of plaintiff's civil complaints, was not conclusively established by reason of the plea. Summary judgment was denied.

Finally, the Second Circuit case of *United States v. Guzzone*, 273 F.2d 121 (2d Cir. 1959) echoes the propositions put forth in *American Packing* and *Grunstein.* In that case the Court found that defendants' plea of guilty to a conspiracy charge estopped their later denial of the conspiracy or of the overt acts allegedly a part of the conspiracy. The plea did not, however, establish substantive facts not essential to the conspiratorial behavior of defendants.

In summary, it is clear that plaintiff cannot hope to use defendant Stone's and Rosenbaum's admission to a conspiracy to defraud the Government under 18 U.S.C. § 1001 as a catch-all for conclusively establishing the specific manner by which that conspiracy was effectuated, even though a recital of the alleged scheme is included in Count 1 of the indictment. Instead, the plea of guilty to conspiracy only serves as an admission of the necessary elements of 18 U.S.C. §§ 371 and 1001: *viz.,* that defendants conspired to defraud the United States through knowingly submitting false, fictitious or fraudulent statements or representations to the United States. The fact that defendants allegedly formed "sham" corporations to effectuate such misrepresentations, and that they caused the fabrication of cost data for various contracts is not essential to the fact that a conspiracy existed. Indeed, defendants could be guilty of criminal conspiracy even if their conspiracy were detected and interrupted before they were able to submit any false claims to the Government.

### 4. *Summary of Estoppel Effect*

As explained above, defendants' prior guilty plea to nine counts of a criminal indictment under 18 U.S.C. §§ 371 and 1001 collaterally estops them from relitigating issues essential to the convictions. As a result, defendants are liable under the False Claims Act for false certificates and Form RB–1 described in Counts 3, 7, 8, 9, 10, 11, 15, and 16. They also are liable for conspiracy under the False Claims Act by reason of their plea of guilty to Count 1 of the indictment. Their plea on that count, however, does not conclusively establish the substantive counts incorporated in Count 1's explanation of the effectuation of defendants' conspiracy.

### C. *Summary Judgment for Claims not Admitted by Defendants' Guilty Pleas*

Plaintiff has filed an extensive statement of material facts allegedly not in dispute as

support for its motion for summary judgment. It suggests that its statement, when taken in conjunction with depositions and other supporting material, conclusively establishes that defendants presented 1,522 false claims for payment to the Government in contravention of the False Claims Act. Plaintiff also alleges that the damages flowing from the purportedly false claims are not in dispute, and it asks for a False Claims award totalling $14,870,626.22. In the alternative, plaintiff contends that it is entitled to recover several million dollars in alleged overcharges under the theory set forth in the Third Claim, recoupment of public funds paid by mistake and under the Anti-Kickback Act. The United States also argues that it has established the Fifth Claim based on facts not in dispute, and thus it asks that the Court impose a constructive trust on certain assets that purportedly represent the fruits of the fraudulent conduct.

Defendants vigorously oppose plaintiff's motion by contending that material facts regarding the allegedly false payments remain in dispute.

After a careful review of the record in this case, the Court concludes that plaintiff is not entitled to summary judgment for those allegedly false statements that are not established by defendants' guilty pleas, except that defendants have been proven liable for certain fictitious claims submitted to the United States under the Western Molded stage of the alleged fraud.

### 1. Summary Judgment Standard of Scrutiny

Plaintiff bears a heavy burden in order to prevail on a motion for summary judgment. Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*

This Circuit has recognized that a party seeking summary judgment bears a heavy burden of showing an absence of material, disputed facts; inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See generally Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). As recently summarized by our Court of Appeals in *Lee v. Flintkote Co.,* 593 F.2d 1275, 1281–82 (D.C. Cir. 1979):

In the federal courts, a party moving for summary judgment bears the burden of establishing the absence of any issue of material fact. This principle obtains although the movant would not have the burden of proof at trial. Moreover, the party opposing summary judgment need not present any evidentiary matter unless the movant has made a prima facie showing that the case is completely free from any significant question of fact.

*See also Smith v. Nixon,* 606 F.2d 1183 (D.C. Cir. 1979).

### 2. Material Facts to be Proven

Before the Court can evaluate whether "material" facts are in dispute in this case, it must identify the essential elements of a violation of the False Claims Act, the doctrine of recoupment of public funds paid by mistake, and the Anti-Kickback Act. Accordingly, the Court quickly reviews the necessary elements of each.

a) *The False Claims Act.* For purposes of the remaining issues in this suit the False Claims Act applies to persons who: "make or cause to be made, or present or cause to be presented, for payment or approval ... any claim upon or against the Government of the United States ... knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry..." 31 U.S.C. § 231.

The essential elements of the False Claim Act at issue in the present suit include the "false, fictitious, or fraudulent" nature of the claims presented to the Government, and the fact that defendants "know" that the claims are false, fictitious or fraudulent.

■ The "knowing" requirement of the False Claims Act has caused some confusion among courts. Some courts have applied common law fraud principles and held that in order to prevail, plaintiff must demonstrate that defendants had a "specific intent" to defraud the Government of the United States. *See, e. g., United States v. Aerodex,* 469 F.2d 1003 (5th Cir. 1972); *United States v. Mead,* 426 F.2d 118 (9th Cir. 1970); *United States v. Hangar One, Inc.,* 406 F.Supp. 60 (N.D.Ala.1975) *reverse on other grounds,* 563 F.2d 1155 (5th Cir. 1977). The preponderant, and better view, however, is that the Act only requires that the defendant knowingly present a false claim to the Government. *See United States v. Hughes,* 585 F.2d 284 (7th Cir. 1978); *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47, 58 (8th Cir. 1973); *United States v. Krietemeyer,* 506 F.Supp. 289, 292 (S.D.Ill.1980). This view is supported both by the language of the statute, which identifies only "intent to defraud" as the requisite state of mind, and by the fact that the statute is remedial and civil, rather than criminal, in nature.

■ Despite the fact that plaintiff need only prove that defendants had knowledge of the submission of false claims and not a specific intent to deceive the Government, the United States must prove that defendants had "actual knowledge." It is not enough to allege that defendants knew "or should have known" that certain claims presented to the Government were false, fictitious or fraudulent. *United States v. Ekelman & Associates, Inc.,* 532 F.2d 545 (6th Cir. 1976). For example, a defendant's certification of the truth of information given to the Government "to the best of his knowledge or belief" does not demonstrate the actual knowledge of the falsity of the claims that is required to support a violation of the False Claims Act. *Id.* at 550. Also, there is some authority that plaintiff must prove defendants' knowledge of the falsity of various claims, and the falsity of the claims themselves by "clear, unequivocal, and convincing evidence." *See, e. g., United States v. Ueber,* 299 F.2d 310, 314 (6th Cir. 1962).[19]

■ b) *Recoupment of Public Funds Paid by Mistake.* It is a well-established principle that the Government generally can "recover funds which its agents have wrongfully, erroneously or illegally paid." *United States v. Wurts,* 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938); *Wisconsin Central Railroad v. United States,* 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399 (1896). This common law basis for recovery of funds runs against a person "who received them *by mistake* and *without rights,*" *United States v. Wurts,* 303 U.S. at 416, 58 S.Ct. at 638 (emphasis added)—these are the material elements that must be proven in order to establish the right to recovery under the doctrine.

■ c) *Imposition of a Constructive Trust.* The imposition of a constructive trust is an equitable device designed to deny the use and enjoyment of property to persons who gained the property through wrongful means. *See, e. g., Independent Coal & Coke Company v. United States,* 274 U.S. 640, 47 S.Ct. 714, 71 L.Ed. 1270 (1926). The imposition of a constructive trust requires proof of three elements. First, there must be a wrongful act. *See, e. g., Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Second, specific property acquired by the wrongdoer must be

**19.** The Court does not necessarily adopt this substantive standard of proof because defendants have put sufficient material facts in dispute to avoid summary judgment regardless of the standard of proof that would be applied to their conduct at trial. It appears to the Court that the *Ueber* Court's requirement of "clear, unequivocal and convincing" evidence may not be appropriate. Like the "specific intent" requirement, the "clear, unequivocal and convincing" standard is based on common law fraud requirements, not on the language of the False Claims Act.

traceable to the wrongful behavior. *St. Louis & San Francisco & Co. v. Spiller*, 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060 (1926); *Reynolds v. Whitin Machine Works*, 167 F.2d 78 (4th Cir. 1945), *cert. denied*, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948). Finally, there must be a reason why the party holding the property should not be allowed in good conscience to keep it.

d) *The Anti-Kickback Act.* To recover under the Anti-Kickback Act, plaintiff must establish two elements. First, plaintiff must prove that a payment was made by a subcontractor to an employee or agent of a prime contractor with the United States, or of a higher tier subcontractor under such a prime contract. 41· U.S.C. § 51. Second, plaintiff must prove that such payments were made "as an inducement for the award of a subcontract or order from the prime contractor of any subcontractor, or as an acknowledgement of a subcontract . . . previously awarded." *Id.*

### 3. *Material Facts in Dispute*

Defendants dispute certain material facts that are essential to plaintiff's various theories of liability and damages. If defendants' disputes are "genuine," and if they focus on "material facts," *i. e.*, facts that are essential ingredients of plaintiff's theories, then plaintiff's motion for summary judgment must be denied. *See* F.R. Civ.P. 56 and discussion *supra.*

The Court finds that defendants have put into genuine dispute certain facts that go to the heart of plaintiff's False Claims Act, recoupment of public funds paid by mistake, constructive trust, and Anti-Kickback Act theories of liability. Only certain material facts relating to the Western Molded Stage of the alleged fraud are not in genuine dispute, and these undisputed facts suffice to establish certain False Claims Act violations that will be detailed below. Defendants also have put into genuine dispute facts essential to plaintiff's claimed damages, and thus summary judgment as to damages must be denied. The following discussion describes, in general terms, the material facts that defendants have genu-inely disputed. Each stage of the alleged fraud is considered in turn.

#### a) *The Scientific/Bregman Stage*

Plaintiff lays the ground work for the bulk of its False Claims Act, recoupment of public funds paid by mistake, and constructive trust claims by describing the formation and activities of Scientific and Bregman. *See generally* Plaintiff's 9(h) Statement ¶¶ 14–59. It contends that both companies were "dummy corporations" subject to the direction, control and use of defendants. Plaintiff alleges that these "sham" organizations were falsely represented to the Government as subcontractors who assembled the electrical components for Chromcraft's rocket launchers. The representation allegedly was false because, according to the Government, Scientific and Bregman were only a "paper operation." Stone and Rosenbaum supposedly caused the creation of purchase orders, invoices, receiving reports, and the like between Scientific/Bregman and Chromcraft when in fact Wolf·remained the actual·assembler of electrical components and when Chromcraft provided Wolf with the raw materials and Wolf delivered the completed assemblies directly to Chromcraft. The United States also contends that the prices stated on Scientific and Bregman's invoices to Chromcraft were inflated: they were higher than the cost of the raw materials and the cost of Wolf's assembly charge, even though neither Scientific nor Bregman did any actual production work to earn what they received. Indeed, the Government suggests that it did not know of the Chromcraft/Scientific-Bregman/Wolf relationship at all; if it had, it allegedly would not have paid the claims presented to it by Chromcraft. Finally, plaintiff alleges that defendants siphoned off the allegedly-inflated profits of Scientific and Bregman into Swiss bank accounts that were established for their own benefit and use. The money was siphoned off by means of fictitious invoices for raw materials that were sent to Scientific and Bregman by foreign companies, acting at the direction of Stone and Rosenbaum.

The Government concludes that Rosenbaum and Stone are liable for hundreds of false claims submitted to the United States during this period, claims based on artificially high prices and/or that concealed the true nature of Scientific's and Bregman's negligible role in the assembly of electrical assemblies. Defendants, however, have put into issue several material facts that undermine the basic theory of the Chromcraft/Scientific-Bregman/Wolf relationship so that it would be inappropriate to grant summary judgment on the hundreds of false claims alleged.

First, defendants strongly contend that neither Scientific nor Bregman were "sham" corporations. Both of them consistently have stated throughout the course of this litigation that the two companies were pioneered in the hope that they would become "second suppliers" of rocket launcher electrical assemblies, complementing Wolf. They state that Chromcraft was receiving increasing Government requests for rocket launchers because of Chromcraft's quality, reliability and low cost, and that Wolf was an undependable supplier of the electrical components of the launchers. Neither Stone nor Rosenbaum admit that they controlled the two companies, except inasmuch as any sole customer "controls" any supplier's business. They further contend that they made great efforts for Scientific and Bregman to become established suppliers, envisioning them to take complete control of the electrical operation, much as an earlier subcontractor, Insul–8, had done previously. The defendants explain that Chromcraft had been forced to become involved in certain aspects of Wolf's assembly operations because of Wolf's inability to handle any responsibilities other than assembly itself. Chromcraft was interested in outfitting Scientific and Bregman with the quality control, inspection, and research and development capability that Wolf lacked, and it was Scientific and Bregman's responsibilities in these matters that justified a markup in electrical assemblies that exceeded the simple cost of raw materials and assemblies.

Defendants buttress this explanation by pointing out that the overall cost of the launcher was, by all accounts, a "lot of launcher" for the price. See, Hearings Before A Subcommittee of the House Committee on Government Operations, 90th Cong.2d Sess. 26 (1968) (statement of Barry J. Shillito, Assistant Secretary of the Navy).

Indeed, defendants point out that Bregman's and Scientific's prices were competitive with other vendors, evidencing the fact that the difference between the total cost for the electrical components and the mere cost of raw materials and assembling charge was merited. The fact that Chromcraft directly supplied raw materials to Wolf and that Wolf directly delivered completed assemblies to Chromcraft does not mitigate the legitimacy of the operation, according to defendants. They point out that such practices are common in the industry; subvendors often "drop ship" their product to the prime contractor. Also, defendants contend that the Government knew that Wolf was involved in the assembly operation, and it did not complain about Wolf's participation.

Finally, defendants admit that Chromcraft's failure to bill Scientific and Bregman for the raw materials used in the assemblies, and to fabricate invoices for materials from foreign firms and thereby siphon off income into Swiss accounts was a tax avoidance device. Indeed, the Internal Revenue Service has determined tax deficiencies and penalties against defendants on the theory that the transactions in Switzerland resulted in understatement of taxable income. A petition for redetermination of the deficiencies and penalties is under submission in the United States Tax Court. Defendants do not admit, however, that their alleged tax avoidance scheme constituted actionable false claims against the United States.

The Court is persuaded that defendants have put into general dispute some material facts underlying the Government's allegations relating to the Scientific/Bregman stage of the alleged fraud. First, the nature of Stone's and Rosenbaum's "control"

of Scientific and Bregman is in dispute.[20] It is not clear whether Scientific and Bregman had an independent life of their own. More importantly, there are questions about whether the use of Scientific and Bregman as subcontractors/vendors in charge of electrical assemblies for the rocket launchers was a sham. The Court cannot now accept plaintiff's arguments that these companies had no purpose but to fabricate a flow of paper. Defendants persuasively argue that Chromcraft was unhappy with Wolf, both because he was the sole supplier of the assemblies, and because Chromcraft was unable to depend on Wolf for quality control, inspection, research and development, and the like. Accordingly, it is a reasonable inference that Chromcraft wished to put responsibility for total management of the electric component assemblies on Scientific and Bregman, in the hope that through their relationship with Wolf they might themselves gain the expertise required to become a "second supplier" of the assemblies to Chromcraft. The fact that Wolf continued to receive raw materials during this period from Chromcraft, and the fact that it delivered the assemblies directly to Chromcraft is not conclusive evidence that the intermediaries, Scientific and Bregman, were shams. Defendants have shown that "drop shipping" is an industry practice, as is the purchase of raw materials by third parties. Finally, the alleged "siphoning" of excess profits has been put into dispute by defendants. They contend that the money sent by Scientific and Bregman to foreign firms did not represent excess profits but instead represented the amounts paid to Scientific and Bregman by Chromcraft for raw materials and not recouped by Chromcraft after the latter's free delivery of the materials to Wolf. As such, the siphoning off of this money to Europe may have represented a tax avoidance scheme,[21] but it remains disputed whether any false claims vis-a-vis the price of electrical assemblies paid by the United States resulted from the practice. Finally, defendants allege that

the Government knew that Wolf was assembling the electrical components of the launchers, and that Government inspectors actually had visited Wolf's operation.

Defendants thus have put in substantial dispute material facts relating to the overall Scientific/Bregman stage of the allegedly fraudulent schemes. The Court accordingly cannot grant summary judgment on any of plaintiff's theories. They have not shown the required falsity, fictitiousness or fraudulence of the claims, nor have they demonstrated actual knowledge of such, as required under the False Claims Act. Plaintiff also has not demonstrated that it paid Chromcraft "by mistake" nor, more importantly, have they shown that defendants had no right to the contract money, as required under the "recoupment of public funds paid by mistake" theory. Finally, defendants have put into dispute the alleged "wrongfulness" of their acts, as well as the nature of the money "siphoned" from Scientific and Bregman to foreign bank accounts, and therefore a summary judgment motion based on a constructive trust theory must be denied.

b) *The Republic Stage*

As explained at the outset of this Memorandum, the Government contends that Stone and Rosenbaum used Republic in much the same allegedly false, fictitious or fraudulent manner as it had used Scientific and Bregman. That is, Republic was used by Chromcraft as a "front" intended to disguise cost overcharges for electrical assemblies. Republic was the purported assembler of the electrical components, according to plaintiff, while Wolf continued to assemble the great bulk of the components. Chromcraft allegedly hid Wolf's continued role in the assembly operation for passing along inflated costs to the Government.

Defendants have put several material facts into dispute that require the Court to deny summary judgment for plaintiff on any theory for defendants' conduct during

---

**20.** These facts have been developed in the Tax Court case now under submission.

**21.** These facts have also been developed in the Tax Court case now under submission.

this stage of the alleged fraud. Specifically, defendants point out that Republic was acquired by the Falrock Corporation, a company that neither Stone nor Rosenbaum controlled. Secondly, and more importantly, they contend that Chromcraft looked to Republic as its needed "second supplier" after the Scientific and Bregman experiments failed. Republic was, after all, an established electronics firm, and it demonstrated the potential to take full responsibility for electrical assembly, unlike Wolf.

As it developed, Republic did, in fact, not only assist Chromcraft by taking general responsibility for Wolf's assembly operation, but Republic itself became Chromcraft's long-awaited "second supplier"—it also engaged in the assembly process.

In sum, defendants have put into genuine dispute plaintiff's assertion that Republic was controlled by Stone and Rosenbaum, and was used by them to deceive Government contracting personnel. Plaintiff has not conclusively established that any false, fictitious or fraudulent claims were presented to the Government during this stage of the alleged fraud, so no False Claims Act liability can prevail at this stage of the litigation. Likewise, plaintiff has not shown that Government funds were paid by mistake to Chromcraft during this period, nor has it demonstrated that Chromcraft had no right to the funds it requested from the Government. Accordingly, plaintiff cannot now prevail under the doctrine of recoupment of public funds paid by mistake. Similarly, the United States cannot now establish a constructive trust based on alleged improprieties during the Republic stage. No improprieties have been established by undisputed material evidence and, even if they had, the fruits of the allegedly wrongful acts have not been traced to repositories shown by the undisputed material evidence to be under the control of Stone and Rosenbaum.

### c) *The Western Molded Stage*

Defendants have introduced a genuine dispute regarding alleged "kickbacks" paid by Western Molded to Chromcraft during the final stage of the alleged fraud. Defendants present an arguable explanation for the price increase for fairings charged by Western Molded and allegedly set aside as kickback money for Chromcraft to "induce" the award of their business or to "acknowledge" previous awards. *See* 41 U.S.C. § 51. Defendants allege that part of the money was attributed to Western Molded's higher costs for the new "grenade" type fairing, and that the rest of the increased cost represented research and development costs that DeLuca, Western Molded's president, recognized as owing to Chromcraft.

Thus, defendants have put into dispute whether the alleged kickback accrued to Stone's and Rosenbaum's personal use and whether it played any role at all in Western Molded's continued subcontracting work for Chromcraft. Instead, the money arguably was set aside for Chromcraft as consideration for legitimate recoupment costs for Chromcraft's considerable investment in the development of new designs for rocket launchers.

 In establishing a valid summary judgment defense for the alleged kickbacks under the Anti-Kickback Act, however, defendants also have made admissions that require the Court to grant summary judgment in favor of plaintiff under the False Claims Act. Specifically, defendants have admitted that they caused fictitious invoices to be sent by certain foreign companies to Western Molded, requesting payment for certain raw materials that never were delivered nor intended to be delivered to Western Molded. Admission of this fact demonstrates that defendants had "actual knowledge" of the fictitiousness of certain claims made against the Government. Accordingly, summary judgment lies in plaintiff's favor under the False Claims Act for those claims.[22]

22. The claims based on the false invoices sent by foreign companies to Western Molded will be precisely delineated in the pretrial order and

should be more precisely identified by plaintiff in its pretrial brief. The Court need not reach the validity of the claims of recoupment of

*d) Damages*

While defendants' guilty pleas do establish their liability under the False Claims Act for false certificates and Forms RB–1 described in Counts 3, 7, 8, 9, 10, 11, 15, and 16, they do not determine either the statutory forfeiture or the amount of actual damages for which defendants are liable under the Act. Therefore, summary judgment on the damages issue, as the Government requests, is inappropriate.

Since 31 U.S.C. § 231 provides for a $2,000 forfeiture for each false claim made, a threshold question which must be resolved before the statutory forfeiture can be computed is: what constitutes a "claim" under the False Claims Act? It is clear from the case law that each "individual false payment demand" under a government contract which, as in this case, calls for numerous payments constitutes a false claim. *United States v. Bornstein,* 423 U.S. 303, 309 n. 4, 96 S.Ct. 523, 528 n. 4, 46 L.Ed.2d 514 (1976). This conclusion is consistent with the Supreme Court's earlier statement that the statutory term "claim" should, in order to effect the remedial purposes of the Act, be broadly construed to include "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968). Plaintiff accordingly argues that each invoice that was submitted to the Government constituted a "claim since each represented a demand for payment of money." Plaintiff contends that 794 such invoices fall under Counts 3, 7, 8, 9, 10, 11, 15, and 16. Defendants, however, argued that each Public Voucher, Form DD 1034, constituted a "claim" under the Act because the vouchers, and the invoices, cause the payment of money under the United States

Government procurement procedures. The Court is, however, unable to determine on the basis of counsels' assertions which of these interpretations is correct because application of the legal standard turns primarily on specific facts not clearly presented to the Court at this time, namely: were those invoices which are listed together on public voucher Forms DD 1034 presented for payment at one time, and attached to the vouchers, or were they individually submitted as separate demands for payment? [23] *See, e. g., United States v. National Wholesalers,* 236 F.2d 944, 950 (9th Cir. 1956). ("In the absence of evidence that . . . *the invoices attached by the Army to a single voucher were not sent in together by the supplier,* and attached to vouchers by the Army as submitted, it would seem that the number of claims should be computed on the number of vouchers rather than the number of invoices") (emphasis supplied).

Second, as to actual damages, the indictment does not detail damages allegedly flowing from the various counts and thus defendants did not admit to any specific damages. Plaintiff nonetheless asserts that summary judgment on the issue of actual damages is appropriate and it has proffered the affidavit of FBI Agent Edwin Kelly to show the specific damages suffered as a result of the violations under the False Claims Act. Defendants present several defenses to those computations, and the Court finds that those defenses have put material facts into dispute so that the Court cannot grant summary judgment on the issue of damages, even for those claims for which liability has been established.

The Court specifically finds that defendants have genuinely disputed certain important premises of Agent Kelly's computations. Defendants contend that Agent Kel-

---

public funds paid by mistake and imposition of a constructive trust because those theories are pleaded in the alternative to the False Claims Act.

**23.** Another difficult and novel question which requires resolution before computation of the statutory forfeiture is: what is the amount of the forfeiture resulting from an admitted conspiracy under the Act? *See, e. g., United States*

*v. Kates,* 419 F.Supp. 846, 854 and n. 12 (E.D. Pa.1976). Also, the evidence may show that defendants are entitled to a set-off against the double damages authorized under the Act because of any compensatory payments already received by the Government from any source. *See generally, United States v. Bornstein, supra,* 423 U.S. at 314–317, 96 S.Ct. at 530–531.

ly did not accurately compute the scrap/repair costs pertaining to the assembly of electrical components; they also take issue with Agent Kelly's premise that the addition of the cost of the raw materials plus the bare-bone cost of assembly, together with some percentage allowance for administrative expenses and the like represent the real cost of assembling the electrical components. Instead defendants argue that Kelly has not included the cost of quality control, inspection, and importantly, research and development into his computations. The Court concludes that defendants have, through their broad ranging attack on Kelly's computations, put them in genuine dispute. Plaintiff has not met its "heavy burden" under Rule 56, although it may well prevail when the case reaches the merits.

### ORDER

For reasons more fully stated in the accompanying memorandum, it is, this 21st day of August, 1981, hereby

ORDERED: That defendant Stone's motion to dismiss the Third and Fifth Claims is denied; and it is

FURTHER ORDERED: That defendant Stone's motion to dismiss the Second Claim is granted; and it is

FURTHER ORDERED: That defendant Rosenbaum's supplemental motion to dismiss is denied; and it is

FURTHER ORDERED: That plaintiff's motion for summary judgment is granted in part and denied in part. Judgment for plaintiff is granted, for liability only, for conspiracy under the False Claims Act, 31 U.S.C. § 231, and for specific false claims made under contract numbers NOw 64–0190f; NOw 65–0121f; NOw 65–0472f; NOw 65–0547f; NOw 66–0082f; NOw 66–0307f; and for Form RB–1 filed June 2, 1965 and Form RB–1 filed April 28, 1966; and it is

FURTHER ORDERED: That a status conference in this case will be held on September 22, 1981, to discuss the scheduling of the remainder of this action for trial, specifically the scheduling of pretrial briefs lead-

ing to a pretrial order which will build upon the issues here resolved and, it is hoped, further refine and isolate the particular issues for trial. The Court also wishes to discuss the desirability of separate trials for liability and damages.