Kal W. LINES, Appellant,

v.

FALSTAFF BREWING CO. et al.,
Appellees.

No. 14821.

United States Court of Appeals
Ninth Circuit.

May 15, 1956.

Rehearing Denied June 15, 1956.

Max H. Margolis, San Francisco, Cal., for appellant.

Shapro & Rothschild, Arthur P. Shapro, San Francisco, Cal., for appellee.

Before POPE, LEMMON and CHAMBERS, Circuit Judges.

LEMMON, Circuit Judge.

In one of the finest passages in judicial literature, Chief Judge Cardozo of the New York Court of Appeals —later Associate Justice of the United States Supreme Court—laid down the high standards that should be demanded of a trustee:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, *but the punctilio of an honor the most sensitive,* is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. [Case cited.] Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." [1] [Emphasis supplied.]

Imposed both by ethics and equity, these high standards are exacted of bankruptcy trustees as much as of other species of the genus. "The punctilio of an honor the most sensitive" must be observed in the *selection* of such trustees as well as in their own discharge of their duties.

1. *Statement of the Case*

The appellees, sixteen creditors of Alfonso Paul Sanfilippo, who was adjudged a voluntary bankrupt on April 19, 1954, had claims aggregating $3,735.56. These claims, plus those of four other creditors, Edwin J. Marino, Pacific Coast Brands, Eagle Vineyard Products and Gallo Sales Company, were all presented for voting at the first meeting of creditors by the attorneys in fact designated in the powers of attorney in their respective proofs of claim.

These twenty claims, aggregating $4,508.67, were voted for John M. England, as trustee. Only one of these claims, that of Pacific Coast Brands, for $193.85, was not objected to by the appellant.

On December 17, 1953, the bankrupt made a general assignment of all the assets of his business to the Board of Trade of San Francisco, for the benefit of his creditors. The Board of Trade had in its hands assets of the bankrupt amounting to $4,054.88, according to the bankrupt's sworn statement of affairs.

On April 23, 1954, claims were admittedly solicited by the Creditors' Committee of five members at the Board of Trade, using the letterhead of the Board. Creditors were requested to return an "enclosed * * * form of proof * * to the undersigned Committee *in care of the Board of Trade.*" [Emphasis supplied.] The letter also recited that the Committee had been "appointed at the general meeting of creditors *held at the Board last December.*" [Emphasis supplied.]

Walter J. Hempy, secretary of the Board of Trade, was named assignee in the general assignment made by the bankrupt for the benefit of creditors, before the voluntary petition was filed.

---

1. Meinhard v. Salmon, 1928, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1, 5.

The referee found that "all the activities of the membership of the Creditors' Committee * * * after the making * * * of the aforesaid assignment, were as members of said Board of Trade and not merely as creditors of the said" bankrupt.

The referee also found that there were 19 claims voted by Arthur P. Shapro, counsel for the appellees, aggregating $4,314.82, which claims were objected to by the appellant and the creditors represented by him; and that "it was the intent, on the part of said Creditors' Committee, acting for said Board of Trade, indirectly to keep, if possible, some sort of control over the assets of the estate of the above-named bankrupt, at least to the extent of such assets as were in the hands of Walter J. Hempy and/or said Board of Trade."

The referee also found that "it would not be * * * for the best interest of all the creditors * * * and particularly the creditors [that] are not members of said Board of Trade to count the claims procured in the manner, and under the circumstances aforesaid, in voting for any candidate for trustee * * *." The referee added:

"That John M. England has but one (1) claim, in the sum of $193.88 [$193.-85], favoring him as trustee, to which no valid objection has been made.

"That [the appellant], so far as number was, and is, concerned herein, has three (3) claims aggregating the sum of $375.65, favoring him, as trustee herein, to which no valid objection has been made, and that none of such claims is that of any member of said Board of Trade.

"That [the appellant], so far as amount was, and is concerned herein, has five (5) claims (including the three (3) last mentioned claims) in the total sum of $407.21 favoring him, as trustee herein, to which no valid objection has been made, and that none of said claims is that of any member of said Board of Trade.

"That nothing herein contained is intended to be construed, nor is it, any reflection whatsoever, on said John M. England to act as trustee in bankruptcy."

The referee concluded that the appellant "has a majority, both in number and in amount of the claims of creditors which are entitled to be counted herein to be voted for trustee"; and "to allow any of the * * * 19 claims to be voted for any candidate for the herein trusteeship would be for the court to act contrary to the dictates of sound judicial discretion and also contrary to good practice in the bankruptcy court of this jurisdiction."

At a meeting of creditors held before the referee, counsel for the appellant disavowed any contention that England would administer the estate "other than impartially, fairly, and accurately", but pointed out that "the Board of Trade has an interest in this matter to be reimbursed for any expenses it incurred."

"The Creditors' Committee," counsel contended, "being members of the Board of Trade, would have to make up any deficiency, it not being a profit-making organization. Therefore, it seems to me it would be sufficient interest, where the Board of Trade took an active part in securing these powers of attorney, to disallow the election on the basis of the claims before this Court."

In its "Memorandum and Order", the District Court conceded that "The rule in this circuit is that the findings of the referee should not be set aside unless clearly erroneous"; and that the District Court "does not hold that referees in bankruptcy have lost their supervisory power over the election of a trustee". The District Judge added, however, that he would "examine the proceedings before the referee to see if that power was exercised for good cause". In re San Filippo [sic], D.C.Cal., 1955, 130 F.Supp. 312, 314.

And it is upon this question of "good cause" that the present case turns.

2. *A Court of Bankruptcy Is a Court of Equity.*

In Pepper v. Litton, 1939, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281, the Court said:

"* * * this Court has held that for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'. [Case cited.] By virtue of § 2 [of the Bankruptcy Act] a bankruptcy court is a court of equity at least in the sense that in the exercise of the jurisdiction conferred upon it by the act, it applies the principles and rules of equity jurisprudence. [Case cited.]" [2]

3. *The District Court and This Court Should Accept the Referee's Findings Unless They Are "Clearly Erroneous".*

General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53, reads as follows:

"Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, *and the judge shall accept his findings of fact unless clearly erroneous*. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." [Emphasis supplied.]

In Earhart v. Callan, 9 Cir., 1955, 221 F.2d 160, 164, certiorari denied, 1955, 350 U.S. 829, 76 S.Ct. 59, we said:

"The scope of review which the District Court and this court affords to orders of a referee in bankruptcy is governed by the General Orders in Bankruptcy. * * * These Orders, as implemented by Rules 52(a) and 53(e) of the Federal Rules of Civil Procedure, 28 U.S.C.A., require the District Court to accept the referee's findings unless clearly erroneous. [Cases cited.] Similarly, this court may not set aside the findings of the referee unless they are clearly erroneous. [Cases cited.]" [3]

4. *Creditors Are Frequently Shortsighted and Careless in the Appointment Of a Trustee.*

Sharp warning that creditors are "apt" to be shortsighted and careless in the selection of a trustee is contained in 2 Remington on Bankruptcy Sec. 1094, pages 631–632:

"The importance of the right choice of trustee cannot be overestimated. In him, administrative power is centered. If an able, vigorous, and independent trustee is appointed, the administration is likely to be equally able, vigorous, and independent. If one is appointed, however, who is indolent, easy-going, *or subject to influence*, there are bound to supervene jobberies, inefficiencies, and rascalities. Eternal vigilance is the price of keeping bankruptcy administration free from fraud and machinations.

\* \* \* \* \*

"The present Bankruptcy Act is founded on the democratic principle of creditors' suffrage—it is the creditors who elect the trustee to administer the estate. But the ballot is abused in the bankruptcy world just as in the world of politics. Creditors, after giving over their claims to their particular instrumentality for collection, *are apt, shortsightedly, to abandon further care; with the frequent result that collusion, bargainings, or shiftlessness take the place of vigorous administration.* In the early days of the

<hr>

2. See also First National Bank of Portland v. Dudley, 9 Cir., 231 F.2d 396, and the case there cited.

3. See also Morris Plan Industrial Bank v. Henderson, 2 Cir., 1942, 131 F.2d 975, 976–977.

Bankruptcy Act, *the soliciting of claims by schemers was reprobated as the cause of the evils. But the solicitation of claims is no longer necessary,* for on notice of the bankruptcy, claims begin to pour in *without solicitations* to the different agencies or organizations for collection; *yet collusions, bargainings, and jobberies seem equally common.* If creditors, into whose hands the policy of the Bankruptcy Act has entrusted the guardianship of insolvent estates, were more awake to the importance to their own interests of the performance of their fundamental duty of choosing and supporting virile, earnest, and *independent* trustees, \* \* \* there would be felt soon in a multitude of ways profoundly salutary effects upon the various business communities." [Emphasis supplied.]

5. *A Referee Has Broad Powers in the Administration of a Bankrupt's Estate, Especially with Reference to the Selection Of a Trustee.*

█ General Order 13 provided as follows:

"'The appointment of a trustee by the creditors shall be subject to be approved or disapproved by the referee or by the judge; and he shall be removable by the judge only.'"

The above order was abrogated on January 16, 1939, effective on February 13, 1939. From this abrogation, the appellees attempt to spell out a referee's complete loss of authority to disapprove the election of a trustee:

"It would seem, therefore, that although prior to February 13, 1939 (under conditions which will be hereinafter discussed, and which are wholly inapplicable to the case at bar), the referee might have undertaken to disapprove the election of a trustee, *under the law applicable to the case at bar, the referee obviously had no such jurisdiction.*" [Emphasis supplied.]

In making this statement, the appellees have fallen into gross error. As we have seen, the Court below whose order the appellees seek to have us affirm, specifically rejected such an interpretation of the abrogation of Order 13, declaring that "this Court does not hold that referees in bankruptcy have lost their supervisory power over the election of a trustee."

The powers of a referee in connection with the administration of a bankrupt's estate remain broad, even since the abrogation of Order 13. In Sloan's Furriers, Inc., v. Bradley, 6 Cir., 1945, 146 F.2d 757, 759, 760, the Court said:

"The actual administration of bankrupt estates is, by the law, left largely to the referees, and it is settled practice not to disturb their acts unless a plain and injurious error of law or abuse of discretion is shown. [Case cited.]"

█ This sweeping supervisory power of a referee includes a reasoned veto of the selection of a trustee. In the case of In re Deena Woolen Mills, D.C.Me. 1953, 114 F.Supp. 260, 267–268, the Court used the following language:

"Although the creditors are the primary participants in the election of a trustee, their choice must be *governed* by the discretion of the Referee in the interest of promptness and impartiality. He presides over the election of a trustee *and determines, with proper judicial discretion, what creditors have the right to vote.* [Cases cited.] His function in the election of a trustee is to exercise a legal discretion in expediting the election and securing an impartial trustee, and *to approve or disapprove the appointment depending upon the circumstances of the particular case.* [Emphasis supplied.]

"As stated in Matter of Rosenfeld-Goldman, D.C., 228 F. 921, at page 923:

'The actual administration of bankrupt estates is, under the present law, left largely to the Referees. It is the settled practice of this court not to disturb their acts in administrative matters—of which the election of a trustee is a typical example —*unless a plain and injurious error of law or abuse of discretion is shown.'* (Emphasis supplied.) [Case cited.]" [4]

The appellees quote extensively— though somewhat inaccurately and repetitively—from an opinion of this Court in Wilson v. Continental Building & Loan Ass'n, 9 Cir., 1916, 232 F. 824, 827, as follows:

"All must agree that the vital interest which creditors have in the preservation and wise management of the estate of the bankrupt must, as a general rule, make them the best judges of who shall be appointed as trustee, and their selection cannot be arbitrarily ignored."

The appellees' second quotation from the *Wilson* case is obviously garbled, and we do not reproduce it here. Had the appellees pursued their first quotation further, however, they would have disclosed this Court's important qualification of the rule:

"*But the Supreme Court, in the exercise of its power to make general orders in bankruptcy, foresaw that instances might arise where, notwithstanding the desire of the creditors for the selection of some particular person as trustee, the best interests of the estate would not be served by allowing such choice to stand, and they reserved a supervisory power in the referee or judge.*

\* \* \* \* \*

"*The duties which a trustee may be called upon to perform under the Bankruptcy Act and General*

*Order 17* \* \* \*, *and others, are often of a character which require him to reclaim property and sue to avoid transfers, to take possession of property, books, and papers belonging to the estate, to redeem and discharge mortgages upon real property, to defend pending suits, possibly to call for assessments upon stockholders of a bankrupt corporation, to demand accountings from those who have business relations with the bankrupt, and to do very many things which can best be done where there is no relationship out of which can arise any conflict of interest, or even serious embarrassment to the trustee, by reason of business relationships, or, in case of corporations, by having directors or officers in common.*" at pages 827, 828 [Emphasis supplied.]

## 6. *The Area of Discretion*

At this juncture it might be well to pause and reflect upon the precise meaning of "discretion"—a convenient expression frequently used, but not often defined.

In Delno v. Market St. Ry. Co., 9 Cir., 1942, 124 F.2d 965, 967, this Court thus expatiated on the subject:

"In a second sense, and the one most commonly meant in the use of the word in the law, 'discretion' is defined as: 'The power exercised by courts to determine questions to which no strict rule of law is applicable but which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court.' 1 Bouv.Law Dict., Rawles' Third Revision, p. 884. Judicial action—discretionary in that sense—is said to be final and cannot be set aside on appeal except when there is an abuse of discretion. A common example is a court's ruling on the extent of

---

4. For cases decided prior to the abrogation of Order 13, see In re Pan-American Match Co., D.C.Mass., 1917, 242 F.

995, and In re Austin Resort & Land Co., D.C.Cal., 1935, 12 F.Supp. 459, 462.

cross-examination. [Case cited.] Discretion, in this sense, is abused when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused ONLY where no reasonable man would take the view adopted by the trial court. *If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."* [Emphasis supplied.]⁵

Since the power of review entrusted to a District Court vis-à-vis the findings of a referee is identical with that of a Court of Appeals with respect to the findings of a District Court, the above excerpt is apposite here. In each case, the findings are not to be set aside "unless clearly erroneous". Cf. General Order No. 47, supra, and Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S. C.A.

**7.** *Since "Reasonable Men Could Differ as to the Propriety of the Action Taken" by the Referee, It Cannot Be Said That He Abused His Discretion.*

It will be recalled that the bankrupt made a general assignment to the Board of Trade; that claims were solicited on letterheads of the Board; that the letter recited that the Creditors' Committee had been appointed at a meeting of the creditors held at the Board; that Hempy, the Board's secretary, was the general assignee; that the Referee found *as a fact* that it was the Committee's intention "indirectly to keep, if possible, some sort of control" over the "bankrupt's assets"; and that the Referee also found that it would not be "for the best interest of all the creditors" to count the claims thus garnered "in voting for any candidate for trustee".

Considered separately, none of these findings might be thought sufficient to support the Referee's holding in favor of the appellant. Taken together, however, they persuade us that, whether we agree with them or not, they are findings regarding which "reasonable men could differ as to the propriety of the action taken."

In the case of In re Stowe, D.C.Cal. 1916, 235 F. 463, 464, Judge Maurice T. Dooling said:

"Neither the bankrupt himself, nor his attorney, *nor an assignee,* nor his attorney, *can be permitted to control the selection of a trustee.* If creditors knowingly join with the bankrupt or his attorney, or *with an assignee or his attorney,* in an effort to do what it has repeatedly been decided they may not do, the simplest and most obvious way to defeat their purpose is to reject their selection of trustee, and permit the creditors who are not in the combination to make the selection. That was done in the present instance and the action of the referee is affirmed." [Emphasis supplied.]

**8.** *"Not Honesty Alone—"*

During the hearing before the Referee, counsel for the appellees made an offer of proof in connection with the testimony of an employee of the attorney for the San Francisco Board of Trade. Counsel proposed to show that the transmittal of the letter referred to above, "and its preparation in this form was at the express instance and request of the Creditors' Committee". It might be observed in passing that all the members of the Creditors' Committee were members of the Board of Trade.

Counsel also offered to prove that the proof of claim that accompanied each letter was prepared by the witness and transmitted by the office of the Board at the request of the Committee; that the designation of the power of attorney, "or the names of the attorneys both in the letter and proof of claim and the letter

---

**5.** See also Langnes v. Green, 1931, 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520.

of attorney for [counsel's] office were so entered at the request of the * * * Committee"; that neither the assignee nor his attorney, nor any member of the Board's staff suggested the designation of the attorneys in fact or the powers of attorney in the claims referred to in the letter; that at no time prior to counsel's announcement in court of his candidate for trustee was the name of any candidate known to the witness or any member of the Board of Trade, including the Committee. Finally, counsel offered to prove by his own testimony that he consulted with no one whatsoever with reference to his candidate for trustee; namely, Mr. England; that the latter had received no information of counsel's intention to nominate him; that Mr. England has no connection with the Board; and that Mr. England would administer the estate "fully, fairly, and honestly, and the fact that there was an assignment to the Secretary of the Board of Trade * * * by the bankrupt within four months immediately preceding the bankruptcy would not in any way influence him in the administration of the estate, nor influence any one, so far as I know, in the administration of the estate."

Taking all the foregoing proffer as equivalent to evidence, we still believe that there was rational basis for the referee's finding that "all the activities of the membership of the Creditors' Committee * * * after the making * * of the aforesaid assignment were as members of said Board of Trade and not merely as creditors of said" bankrupt. It must be remembered that the assignee of the bankrupt was also the secretary of the Board.

As counsel for the appellant points out, it was not at all improbable that there might develop a controversy over the bankrupt's business assets in the hands of the Board. In disqualifying Board-sponsored creditors, the referee exercised a sound discretion.

Finally, the appellees rely greatly upon the appellant's concession that it was

not contended that Mr. England, if elected trustee, "would administer this estate other than impartially, fairly and accurately". There are two complete though cognate answers to the appellees' argument on this point:

First, as Chief Judge Cardozo pointed out in the opinion quoted at the beginning of this opinion, "Not honesty alone, but the punctilio of an honor the most sensitive, is * * * the standard of behavior" for a trustee.

Second, we can here apply to Mr. England language used with regard to another trustee, in the case of In re Bloomberg, D.C.Minn.1931, 48 F.2d 635, 637:

"As a practical matter, I am satisfied that in this proceeding Mr. Miller could administer the estate as well as any other person, and that the creditors' interests *might even be better subserved by him than by any other person,* in view of the fact that he has now had charge of the estate for some two months. *However, the complaint is not against him, but against the method used in securing his appointment."* [Emphasis supplied.]

In that case the District Court reversed the referee's order approving Mr. Miller's appointment. Although the facts in that case were different from those at bar, the decision does bear upon the point that, in a trustee in bankruptcy, mere honesty is not enough. The influences back of his appointment are also important.

9. *Conclusion*

▮ In view of all the circumstances surrounding the securing of nineteen of the twenty claims that voted for Mr. England as trustee, the referee did not abuse his discretion in refusing to count those nineteen claims, and in appointing the appellant as trustee instead.

Accordingly, the order appealed from is reversed, with directions to the District Court to affirm the order of the referee.